IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

SALIX PHARMACEUTICALS, INC.,

　　　　　　　　　　　　　　　Plaintiff,

　　　　　v.　　　　　　　　　　　　　　　　　Civil Action Number 3:04CV412-JRS

PBM PHARMACEUTICALS, INC.,

　　　　　　　　　　　　　　　Defendant.

## MEMORANDUM OPINION

THIS MATTER came before the Court on competing breach of contract allegations between

Plaintiff Salix Pharmaceuticals, Inc. and Defendant PBM Pharmaceuticals, Inc.  Following a two-day

bench trial, the Court makes the following findings of fact and conclusions of law:

### i. Findings of Fact

1.　　Salix Pharmaceuticals, Inc. (hereinafter "Salix") is a California Corporation with its office

　　　and principle place of business in Wake County, North Carolina.

2.　　PBM Pharmaceuticals, Inc. (hereinafter "PBM") is a Delaware Corporation with its office

　　　and principle place of business located in Gordonsville, Virginia.

3.　　PBM sells Donnatal Extentabs, a pharmaceutical product.

4.　　Salix is engaged in pharmaceutical sales and marketing.

5.　　Salix and PBM entered into a "Product Detailing Agreement" (hereinafter "the Agreement")

　　　dated October 30, 2002.

6.      In the Agreement, commencing December 1, 2002, Salix agreed to perform "Details" of

PBM's drug Donnatal Extentabs.  A "Detail" is defined in the Agreement as follows:

> "Detail" shall mean a face-to-face office visit by a Representative [of
> Salix] with a Prescriber or his or her legally empowered designee in
> the [United States], during which the FDA-approved indicated uses,
> safety, effectiveness, contraindications, side effects, warning or other
> relevant characteristics of [Donnatal Extentabs] are described by the
> Representative in a fair and balanced manner consistent with the
> requirements of the [Federal Food, Drug and Cosmetic Act], and
> using, as necessary or desirable, the Product Labeling (as defined
> herein), the [Donnatal Extentabs] promotional materials (as defined
> herein), or a sample Drop, but excluding incidental contracts which
> do not otherwise constitute a Detail as defined in this section 1.1(c).
> When used as a verb "Detail" shall mean to engage in a Detail as
> defined in this section 1.1(c).

7.      Under the terms of the Agreement, beginning on December 1, 2002, Salix agreed to commit

at least 55 sales representatives and 3 national account managers on a non-exclusive basis

to provide marketing services to PBM, in order to "detail" Donnatal Extentabs to physicians.

8.      Section 15.1 of the Agreement requires Salix to "Keep accurate records in sufficient detail

of the number of Details conducted for the product and other information reasonably

requested by PBM regarding such Details."

9.      In the Agreement, Salix agreed that its sales representatives would perform no less than

4,500 Details per calendar month but no more than 7,000 Details per calendar month.

10.     PBM agreed to compensate Salix at the rate of $20.00 for each Detail.

11.     Salix was to invoice PBM for the Details within 45 days after the calendar month in which

the Details were performed, and PBM was to pay Salix by wire transfer within 15 days of

invoice.

2

12. Salix never gave PBM any guarantees or promises that the detailing program would increase sales volume. In fact, PBM (via Mr. Schramm) requested that a Sales Target be included in the agreement but Salix rejected such a term. The Agreement does not require that Salix's services increase the sales of Donnatal Extentabs.

13. The Agreement was for a term of one year. If, however, either party was in any way dissatisfied with the relationship, the Agreement was terminable upon ninety (90) days advance written notice. Section 14.3 of the Agreement states that "Either party shall have the right to terminate this agreement for any reason whatsoever upon at least ninety (90) days prior written notice to the other party."

14. The Agreement further provides that "The Termination of this agreement, other than by PBM pursuant to 14.2 hereof, shall not affect PBM's obligation to pay any amount properly due and payable under the provisions of this agreement."

15. Two individuals negotiated the agreement on behalf of their respective companies. Mr. Rick Scruggs represented Salix in the negotiations and Mr. Jack Schramm negotiated for PBM.

16. The negotiators did not specifically discuss Article 15 of the Agreement, either subsection 1 or 2.

17. Before entering into the Agreement, Salix distributed a prescription medication called Colazal which it continued to distribute concurrently with Donnatal Extentabs. With respect to Colazal, the Salix national sales force used the same Sample Distribution Form that it later adopted and used for the representation and sales of Donnatal Extentabs.

18. In late March 2003, representatives of PBM reviewed and approved a revised Sample Distribution Form that reflected new packaging of sample units of Donnatal Extentabs.

3

19.     During the course of the negotiations Mr. Schramm and Mr. Scruggs did discuss the manner and mechanics of the handling of the sales of Colazal by Salix.

20.     The Sample Distribution Form that was already in use for the Colazal product had to be amended to include reference to Donnatal Extentabs. The form was amended in November of 2002.

21.     Before the effective date of the Agreement, PBM received an advance copy of the Sample Distribution Form and authorized its use. Elizabeth Jean Chappel and Jim McGrath, of PBM, reviewed and approved the Form.

22.     Salix began performing Details pursuant to the Agreement with PBM in December of 2002. Salix employed the same essential process it used to market Colazal. The sales representatives would visit the physician's offices and after the visit fill out the Sample Distribution Form. The sales representatives would send it to J. Knipper and Company (hereinafter "Knipper") in New Jersey. The sales representative would keep a copy of the Sample Distribution Form. Employees at Knipper would input the data from the form into its database on behalf of Salix. On a monthly basis Knipper would generate and send to Salix a report documenting all of the sales activity in the preceding month. Salix would in turn send a copy of that sales report to PBM. Salix's invoices to PBM were directly tied to the monthly sales report. Salix took the number of Details reflected in the monthly report and multiplied that number by $20.00 to produce the final invoice amount.

23.     Salix submitted an invoice to PBM for Details completed in December of 2002. PBM paid the invoice without any request for additional documentation ($80,020.00 for 4,001 details).

4

24. Salix submitted an invoice to PBM for Details completed in January of 2003. Once again, PBM paid the invoice without any request for additional documentation ($135,860 for 6,793 details).

25. By March of 2003, clearly some tension had developed between Salix and PBM. That tension centered around PBM's dissatisfaction with how PBM's product was being represented. PBM's unrealized expectations in terms how the product would be presented and sales movement led to friction between Salix's employees and PBM's employees.

26. The parties agreed to a meeting in Gordensville, Virginia on April 2, 2003. The purpose of this meeting was to clear the air, identify problems with the working relationship and to seek solutions.

27. Prior to that meeting, under the provisions of the Agreement, Salix made the decision to give PBM the contract required 90-day Notice of Termination. Salix gave that notice on April 4, 2003.

28. At the April meeting the parties put on the table their issues and concerns about their working relationship. They decided to move forward and make an effort to improve the relationship.

29. After the April meeting Salix continued to provide detailing services for the months of April, May and June.

30. In April (subsequent to the April 2, 2003, meeting), PBM paid in full an invoice for Details completed in February 2003 ($115,980.00 for 5,849 details).

31. In May, PBM paid another invoice for Details completed in March 2003 ($105, 960.00 for 5, 298 details).

32.   Elizabeth Jean Chappell is and was since May of 2001 employed by PBM, first as Pharmaceutical Manager and later as Vice President in Charge of Sales and Marketing.

33.   In April 2003, Ms. Chappell met with each of Salix's District Managers to discuss Salix's detailing of Donnatal Extentabs.

34.   During April, Ms. Chappell also spent a half-day working in the field and going on sales calls with the Salix sales representative in San Francisco, a entire day working in the field and going on sales calls with a Salix sales representative in Sacramento, and a half-day working in the field and going on sales calls with the Salix sales representative in Philadelphia.

35.   On May 23, 2003, Salix sent PBM an invoice in the amount of $115,360.00 for 5,768 Details completed by Salix's sales representative in April, 2003.

36.   On June 24, 2003, Salix sent PBM an invoice in the amount of $142,640.00 for 7,132 Details completed by Salix's sales representatives in May, 2003.

37.   On August 15, 2003, Salix sent PBM an invoice in the amount of $140,000 for 7,000 Details completed by Salix's sales representatives in June, 2003.

38.   PBM failed and refused to pay Salix for the Details invoiced for the months of April, May and June of 2003.

39.   The three unpaid invoices for the months of April, May and June of 2003 total $398,000.00.

40.   PBM did not request prior to or during the term of the Agreement that Salix create, maintain or produce to PBM narrative notes from each of Salix's sales representatives relating to the Details performed under the Agreement.

6

41.  Pursuant to the terms of the Agreement, PBM could perform an audit of records maintained by Salix in connection with its Details and sampling of Donnatal Extentabs, but such audit was to be at the sole and exclusive expense of PBM.

42.  By letter dated July 28, 2003, PBM demanded an audit of Salix records in accordance with the terms of the Agreement.

43.  In response to this demand, on September 11, 2003, Salix made its records at Knipper's office in Lakewood, New Jersey available for inspection.  Salix provided PBM with access to Salix's documentation with regard to the Details and sampling of Donnatal Extentabs performed by Salix's sales representatives.

44.  Salix incurred and paid $1,855.00 for expenses in connection with PBM's audit of Salix's records at Knipper on September 11, 2003.

45.  PBM has failed and refused to pay Salix for the $1,855.00 in expenses that Salix incurred in connection with the audit.

46.  The audited records of the completed Details revealed 370 Detail calls on the same physician within 48 hours and 115 Detail calls occurring on various Saturdays.

### ii. Conclusions of Law

1.  Paragraphs 15.1 and 15.2 of the Product Detailing Agreement, when read together, create an ambiguity regarding the intent of the parties as to what documentation would support the product detail invoices.

2.  In the event of some ambiguity in the language employed in a written agreement, the subsequent conduct of the parties after executing the contract may be considered to determine the actual intent of the contracting parties.  See Management Systems Associates,

7

Inc. v. McDonnell Douglas Corp., 762 F.2d 1161, 1171-72 (4th Cir. 1985) ("it is presumed that the parties to a contract know best what is meant by its terms") (quoting Chief Justice Stacy in Cole v. Fibre Co., 200 N.C. 484 (1931)); Thompson-Arthur Paving Co. v. Lincoln Battleground Associates, Ltd., 95 N.C. App. 270, 280 (N.C. Ct. App. 1989) ("Evidence of conduct by the parties after executing the contract is not subject to the parol evidence rule, and is admissible to show intent and meaning") (quoting Cordaro v. Singleton, 31 N.C. App. 476, 479 (1976)).

3.  Based on the post-contract behavior of the parties, the Court construes Paragraph 15.1 of the Product Detailing Agreement as follows: Salix was obligated to create and maintain records of the number of Details performed by its Sales Representatives.

4.  Paragraph 15.2 of the Product Detailing Agreement, which related to PBM's audit rights, did not create any different obligation on Salix's part to document the number of Details in any particular manner or format.

5.  Salix did not breach the Product Detailing Agreement.

6.  Salix complied with its obligations under the Product Detailing Agreement in all material respect.

7.  By non-payment of Salix's invoices for the months of April, May and June of 2003, PBM breached the Product Detailing Agreement.

8.  By non-payment of $1,855.00 of audit cost incurred by Salix as a result of PBM's September 11, 2003 audit, PBM breach the Product Detailing Agreement.

9.  The Agreement does not require Salix to create, maintain or produce to PBM narrative notes from each of Salix's sales representatives relating to Details performed under the Agreement.

10.     PBM is entitled to an offset of $9,700.00 for Details that Salix did not prove by a
preponderance of the evidence.  See supra Findings of Fact, ¶ 46; see also Harrods Ltd. v.
Sixty Internet Domain Names, 302 F.3d 214, 226 (4th Cir. 2002) ("Because the
preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of
error between litigants, we presume that this standard is applicable in civil actions between
private litigants unless particularly important individual interests or rights are at stake")
(quoting Grogan v. Garner, 498 U.S. 279, 286 (1991)).

11.     PBM is entitled to an additional offset of $2,640.00 for 132 Details listed in the May invoice
in excess of the Agreement's maximum number of Details per month.  See supra Findings
of Fact,¶¶ 9 and 36.

12.     Salix is entitled to recover from PBM $385,660.00, plus interest, for detailing services
provided during the months of April, May and June of 2003.  Interest will accrue at the legal
rate from the due date of each invoice.  Salix invoiced the April 2003 Details on May 23,
2003, which became due and payable on June 7, 2003.  On June 7, 2003, the legal rate of
interest was 1.13%.  For the May 2003 Details, invoiced on June 24, 2003 and due on July
9, 2003, the legal rate of interest on July 9, 2003 was 1.07%.  For the June 2003 Details,
invoiced on August 15, 2003 and due August 30, 2003, the legal rate of interest on August
30, 2003 was 1.33%.

13.     Pursuant to Paragraph 10 of the Conclusions of Law, Salix failed prove the occurrence of
485 Details as found in Paragraph 46 of the Findings of Fact.  However, PBM did not present
sufficient evidence at trial as to which month these 485 Details occurred.  Therefore, the

Court will distribute the 485 Details evenly over each of the three months to reduce the principle amount upon which interest will accrue for each month.

14.    The interest amounts will be as follows: (1) for the April invoice - 5,768 Details minus 161 offset for a total of 5,607 Details at a total payment of $112,140.00, interest at 1.13% for a total interest award of $1,267.18; (2) for the May invoice - 7,132 Details minus 132 (overage) minus 162 offset for a total of 6,838 Details at a total payment of $136,760.00, interest at 1.07% for a total interest award of $1,463.33; and (3) for the June invoice - 7,000 Details minus 162 offset for a total of 6,838 Details at a total payment of $136,760.00, interest at 1.33% for a total interest award of $1,818.91.

15.    Salix is also entitled to recover the amount of $1,855.00 for the expenses of PBM's audit, plus interest on that sum at the legal rate from the date of the audit for which Salix incurred such expense, September 11, 2003.  The legal rate of interest on September 11, 2003 was 1.33% for an interest award of $24.67.

An appropriate Order shall issue.


ENTERED this 8th  day of AUGUST, 2005



 /s/ James R. Spencer

JAMES R. SPENCER
UNITED STATES DISTRICT JUDGE


10